United States District Court
District Of Maine

| | | |
|---|---|---|
| Kristin A. King, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 1:13-cv-00163-JDL |
| | ) | |
| State Of Maine, Department | ) | |
| Of Corrections, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiff's Objection to Defendants' Motion for Summary Judgment**

<u>**Introduction**</u>

This case is not appropriate for summary judgment. Defendants' motion relies almost exclusively on post-deposition affidavits, disregards the ample evidence of discrimination, harassment and retaliation adduced at the twelve depositions taken in this case, and attempts to gloss over central disputes of fact.

Many of the key facts relied on by Defendants are hotly contested. For example, Defendants assert it is undisputed that former DCF corrections officer Kristin King welcomed the harassment because she looked at pornographic magazines present in the workplace and drew pictures of nudes at work.[1] However, King testified, and a fourteen-year-veteran officer corroborated, that King never looked at pornographic magazines or drew nudes in the workplace. Plaintiff's Statement of Additional Material Facts ("PSMF") 188-89.[2] Defendants likewise claim that use of the hateful slur "bull dyke" by King's immediate supervisor, Defendant Sergeant

---

[1] Defendants' Motion for Summary Judgment ("Motion") at pp.12-14.
[2] All cites to the PSMF are to the paragraph numbers.

Garrison, was an isolated stray remark.[3] However, multiple officers testified that Garrison, as well as most of King's co-workers, regularly used derogatory slurs about King's sex and sexual orientation and singled her out for harassment and unfavorable treatment because she was a woman and a lesbian. PSMF 150-179, 192-199.

On these grounds alone, Defendants' motion for summary judgment should be denied.

### Case Overview

After retiring from a 15-year decorated military career, in 2004 Kristin King became a corrections officer on the night shift at the Downeast Correctional Facility. PSMF 134-36. When she was fired in 2011, King was the only lesbian officer and the only uniformed female correctional officer working at DCF. PSMF 168-69, 191.

Around the time DCF was deciding whether to terminate King, Sgt. Garrison commented to his ex-wife Todd that "I work with a bull dyke." PSMF 262-72. Several officers testified to specific homophobic, sexist, and derogatory remarks by Sgt. Garrison and several of King's male co-workers, including "fag," "dyke," "homo," and remarks that King was "stupid" and incapable and that women should not work at a male correctional facility like DCF. PSMF 150-60, 171-79.

Deposition testimony of eyewitnesses supports the conclusion that Garrison and his male crew created a hostile and abusive work environment for King. Sgt. Garrison and her fellow male officers regularly failed to cover for her like they did for each other, mocked her, played jokes on her, gave her erroneous information, led her astray, and tried to make her look foolish. PSMF 191-96.

Finally, the evidence demonstrates that Garrison and the all-male officers on King's shift launched a concerted campaign to scrutinize King's work and report any errors up the chain of

---

[3] Motion at p.22.

2

command, specifically to get her fired. The evidence also shows that other male officers made

similar or more serious errors with impunity. Two correctional officers testified that they

personally observed Sgt. Garrison instructing Ms. King's co-workers to monitor King and report

back to Garrison. PSMF 155, 221-26. Officers testified, based on their personal observations as

well as a review of DCF count records, that King was a conscientious employee with a good

work ethic and that her inmate count errors were not unusual and did not warrant the uniquely

severe discipline imposed on her. PSMF 137-44, 220, 242-45. She is the only corrections officer

ever fired by Director Jones during his 18-year tenure at DCF. PSMF 209.

## <u>Argument</u>

I.      **There Are Genuine Issues Of Material Fact As To Whether King Was Subjected To A Hostile Work Environment Based Upon Sex Or Sexual Orientation.**[4]

DCF's motion for summary judgment misconstrues King's hostile work environment

claim and misstates the applicable law. A reasonable juror could conclude that (1) the

harassment was severe or pervasive, (2) the harassment was unwelcome, and (3) DCF knew or

---

[4] Plaintiff is pursuing her claims for hostile work environment and discriminatory termination based on sexual orientation under Title VII, consistent with the EEOC's position that discrimination based upon sexual orientation is discrimination "because of ... sex" and therefore prohibited by Title VII. See *Complainant v. Department of Homeland Security*, EEOC Appeal No. 0120110576, 2014 WL 4407422 (Aug. 20, 2014) (explaining that "[w]hile Title VII's prohibition of discrimination does not explicitly include sexual orientation as a basis, Title VII prohibits sex discrimination, including sex-stereotyping discrimination and gender discrimination" and "sex discrimination claims may intersect with claims of sexual orientation discrimination"); see also *Centola v. Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002) ("Sexual orientation harassment is often, if not always, motivated by a desire to enforce heterosexually defined gender norms. In fact, stereotypes about homosexuality are directly related to our stereotype about the proper roles of men and women.") However, the Court need not address here the issue of whether Title VII prohibits discrimination based upon sexual orientation. Defendants chose not to raise the issue whether sexual orientation claims are cognizable under Title VII. Furthermore, as Defendants point out, Plaintiff also pursues her sexual orientation discrimination claims under the Maine Human Rights Act, which expressly prohibits discrimination based on sexual orientation and which applies the same general analysis as would apply under Title VII. *See* Defendants' Motion 15, n.3.

should have known of the harassment and failed to take prompt and appropriate corrective action.

**First**, in contending that the harassment was not severe or pervasive, DCF focuses exclusively on the presence of pornographic magazines at the facility, ignoring the ample evidence that King's direct supervisor and male co-workers mocked, demeaned, ostracized, and subjected her to adverse working conditions because she was gay and female. That evidence of unfavorable treatment, even if not overtly "sexual," is highly relevant to King's hostile work environment claim. *Rosario v. Dep't of the Army*, 607 F.3d 241, 248 (1st Cir. 2010) (reversing summary judgment for employer on hostile work environment claim, reasoning that conduct need not be motivated by "sexual desire," and need not be overtly sex- or gender-specific at all, to support claim).

When King was fired, she was the only lesbian officer at DCF and the only uniformed female correctional officer at DCF; all of the other female officers at DCF worked in the kitchen. PSMF 168-70, 191. King's direct supervisor and co-workers regularly used discriminatory slurs and singled King out for unfavorable treatment because she was a gay woman. Sgt. Garrison regularly demeaned King because of her sex and sexual orientation, stating in front of other officers that King was incapable of doing the job and that there was "nothing they could do because she was a lawyer's dream, being a female, a lesbian and a midget," and laughing along when King's male co-workers made fun of her for being a lesbian. PSMF 151-52. King's co-workers regularly used homophobic slurs such as "homo," "fag," and "dyke," and one senior officer commented that he "didn't really care to be around" gay people. PSMF 153-63. Several of King's male co-workers voiced their views that women should not be permitted to work in a male prison like DCF at all and preferred to work only with other male officers. PSMF 171-74.

Pornographic magazines showing pictures of naked women were a constant presence in staff-only areas at DCF throughout King's employment, including the segregation unit, main control room, and officer bathrooms. PSMF 180-84. ██████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████. PSMF 177-79.

King's supervisor and fellow officers also singled her out for mockery and adverse treatment that, although not overtly gender-specific, further demonstrates the hostile work environment King worked in. King's fellow officers referred to her as "stupid" and said they did not think she could do her job. PSMF 175. Sgt. Garrison and her fellow officers mocked her, played jokes on her, gave her erroneous information, led her astray, and tried to make her look foolish. PSMF 191-96. The male officers on King's shift formed a "boys' club" and shut King out, often socializing outside of work on fishing trips, sports or motorcycle outings, and did not invite King to join. PSMF 165-67.

Beginning in around 2009, Sgt. Garrison and King's male co-workers began to target King for scrutiny and discipline. Two officers witnessed Garrison expressly direct King's fellow officers to "keep an eye" on her and report back to him. PSMF 155, 221-26. In the months that followed, King's male coworkers monitored her to try to find mistakes and when they caught an error in her counts, they immediately reported the error to Sgt. Garrison, rather than following the standard practice of speaking directly to her about it and having her make the correction. PSMF 197, 214-20, 226. When male officers made similar count errors, even if those errors were repeated multiple times, the male officers covered for each other and did not notify the sergeant. PSMF 197-99, 204-06.

A reasonable person could conclude that these degrading sexist and homophobic comments, images, and conduct were not mere isolated incidents or "simple teasing" but instead so "permeated [the workplace] with discriminatory intimidation, ridicule and insult" as to create an abusive work environment. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78, 82 (1998)**.** " [S]ubject to some policing at the outer bounds, it is for the jury to . . . decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 11 (1st Cir. Me. 2015) (citations omitted) (reversing grant of summary judgment for employer on hostile work environment claim based on "atmospheric and job performance-related incidents").[5]

**Second**, a reasonable person could conclude that the harassment was unwelcome. The facts DCF relies on for its contention that King "welcomed" the harassment are almost entirely disputed. King testified, and other officers corroborated, that King never looked at the pornographic magazines at work, nor did she ever draw nudes or show drawings of nudes to others at work. PSMF 188-89. Although King did not formally complain to management, she was offended by the pornographic magazines, phallic drawings, and derogatory comments about her sexual orientation and expressed her concern to other officers, including Officer Dolan. PSMF 163, 185-87. In addition, she repeatedly complained to management that she felt she was being singled out for unwarranted scrutiny and discipline because of her sex and sexual

---

[5] Defendants' contention that the harassment was not severe or pervasive because it did not affect King's ability to do her job is misplaced for two reasons. First, the evidence indicates that the hostile work environment did affect King's ability to do her job: as both King and Officer Dolan testified, King began to feel that she was being singled out for discipline because of her sex and sexual orientation and that caused King significant stress and made it more difficult for her to do her job well, ultimately forcing her to go on medical leave in early 2011. PSMF 239-40. Second, whether the harassment interferes with the employee's work performance is not dispositive; at most it is one factor in the factfinder's "totality of the circumstances" assessment of whether there was a hostile work environment. *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005).

orientation. PSMF 232, 237. Given these critical disputes, a jury could easily find that harassment was "unwelcome."

**Third**, a reasonable juror could conclude that DCF knew or should have known of the hostile work environment and yet failed to take prompt and effective remedial action.

DCF had ample notice of the illegal harassment. The top-ranking management official on duty during King's night shift was her immediate supervisor, Sgt. Garrison. He was the ringleader who not only condoned but actively supported much of the harassing conduct, making discriminatory slurs and directing male officers on his shift to scrutinize King's work and single her out for discipline.[6] PSMF 150-52, 155, 193, 221-26, 262-72.

On King's behalf, union President Dolan repeatedly complained to management that King was being unfairly singled out, including in response to a counseling she received January 2010 and at a disciplinary fact-finding in February 2011. PSMF 232, 237. In addition, pornographic magazines with pictures of naked women were omnipresent in staff-only areas at DCF throughout King's employment. PSMF 180-82. Not surprisingly, King was offended by the pornographic materials and she expressed that to fellow officers, including union President Dolan. PSMF 186-87. Indeed, management apparently received notice of King's concerns because it issued a memo in approximately 2010 stating that they would conduct an investigation into pornography in the workplace. PSMF 190.

Despite having notice of the harassment for years prior to King's termination, DCF took no effective action to remedy it. DCF never investigated King's complaints to management that she was being unfairly singled out because of her sex and sexual orientation at any point prior to

---

[6]To the extent the harassment was supervisory, DCF is vicariously liable unless it can make out the *Faragher/Ellerth* affirmative defense. For the same reasons discussed above, DCF cannot make out its affirmative defense because it did not exercise reasonable care to prevent or correct the harassing behavior.

King going out on medical leave in 2011.[7] PSMF 241. DCF likewise did not take any appropriate action to address the pornography. Indeed, male officers did not do anything about the degrading magazines and they continued to be a daily presence throughout King's employment. PSMF 180-83.

Under these circumstances, a reasonable juror could find a basis for holding DCF liable for the hostile work environment created by its supervisor and officers.

## II.    There Are Genuine Issues Of Material Fact As To Whether DCF Terminated King Because Of Her Sex Or Sexual Orientation.

Defendants' argument for dismissal of King's disparate treatment claims misstates the applicable legal framework and ignores the wide array of evidence of discriminatory animus.[8] Based on this evidence, which includes Sgt. Garrison's describing King with the hateful slur "bull dyke" just around the time that DCF was deciding to terminate King, a reasonable juror could readily conclude that Sgt. Garrison and King's male co-workers harbored hostility toward her as a gay woman and, as a result, launched a campaign to scrutinize her work and report her routine count errors up the chain of command, triggering her termination.[9]

---

[7] The only "investigation" Defendants point to is a long-delayed and half-hearted effort by the EEO Coordinator in June 2011, years after King's first complained that she was being singled out and months after King had stopped working and gone on medical leave. DSMF 32.

[8] Plaintiff pursues only her disparate treatment claim that she was disciplined and terminated because of her sex and sexual orientation. She voluntarily dismisses any claim that DCF discriminatorily denied her the reasonable accommodation of a light-duty assignment because of her sex or sexual orientation.

[9] In arguing that DCF is entitled to summary judgment on Plaintiff's discrimination claims, Defendants do not argue that DCF cannot be held liable for the discriminatory termination on a cat's paw theory. Motion pp. 15-19. In any event, any such argument would fail. The Supreme Court has expressly held that an employer is liable under the cat's paw theory "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422, 131 S. Ct. 1186, 1194  (2011). The First Circuit has recently extended the cat's paw liability recognized in *Staub* to a bad actor influencing the termination who was not a supervisor of the plaintiff. *Velázquez-Pérez v.*

**First**, Defendants incorrectly assert that the law places rigid limitations on Plaintiff's methods of proof of discrimination. In assessing the evidence supporting King's discrimination claims, the court must not "adopt[] a mechanical formula" but instead must conduct a "case-by-case analysis and consider the individual facts of [plaintiff's] claim." *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 (1st Cir. 2009) (reversing summary judgment for employer on sex discrimination claim)(citation omitted). Regardless of whether King's claims are analyzed under the mixed-motive or *McDonnell Douglas* framework, the basic question is whether there is "enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." *Id.*

Defendants erroneously contend that King can prevail on her disparate treatment claims only if she "show[s] that others similarly situated to her in all relevant respects were treated differently by DCF." Motion, p.18. However, the very case Defendants rely on for this proposition states that comparator evidence is just "[o]ne method" of establishing pretext. *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003). Pretext may be established by a wide variety of evidence, including biased comments by managers. *Chadwick*, 561 F.3d at 47-48; *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 171 (1st Cir. 1998) ("Statements by supervisors carrying the inference that the supervisor harbored animus against protected classes

---

*Developers Diversified Realty Corp.*, 2014 U.S. App. LEXIS 9621 ** 12-13 (1st Cir. May 23, 2014). Here, a jury easily could conclude that Garrison and King's male co-workers were motivated by hostility toward King as a gay woman and intended to get her fired when they scrutinized King's work and immediately reported any errors she made up the chain of command. Moreover, those actions were causal factors in the ultimate decisionmaker's decision to terminate King. ███████████████████████████████████████████████████████████████████████████████████████████████████. PSMF 145, 257; DSMF ¶¶50, 54, 76, 83 (citing Garrison Aff. Exhs. A-D).

of people or conduct are clearly probative of pretext"). In addition, pretext may be shown by "[w]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffer[]"; or "deviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events," *Harrington v. Aggregate Industries-Northeast Region, Inc.*, 668 F.3d 25, 33 (1st Cir. 2012)(internal citations omitted).

**Second**, in focusing solely on comparator evidence, Defendants utterly ignore the mountain of evidence of pretext and bias by DCF management and officers, who regularly made slurs and derogatory comments about King's sex and sexual orientation both in and outside the workplace and launched a campaign to scrutinize King and report her errors up the chain of command.

Sgt. Garrison's frequent derogatory comments about King's sex and sexual orientation support a finding that Garrison was personally motivated discriminatory animus.



PSMF 262-72.

PSMF 268.

Sgt. Garrison commented multiple times in front of King's co-workers that King was not capable in her job and there was nothing they could do "because she was a lawyer's dream, being a female, a lesbian and a midget," and laughed along when King's male co-workers made fun of King for being a lesbian. PSMF 150-52. Similar hateful and insulting comments by King's fellow officers likewise indicate that their actions were motivated by bias. Many of the officers on King's shift made homophobic and sexist comments both at on- and off-duty, regularly

10

undermined and mocked King, and excluded her from the "boy's club" on the night shift. PSMF 153-60, 165-67, 171-75. ███████████████████████████████████████████████ ███████████████████████████████████████████. PSMF 158, 227.

The evidence further supports a finding that Sgt. Garrison and King's fellow officers launched a concerted effort to target King for scrutiny and report her routine count errors up the chain of command. Correctional officers at DCF conducted frequent counts (every half-hour over the night shift) and, given the frequency of counts, every officer at DCF made count errors. PSMF 200-02. When a correctional officer discovered an error in a fellow officer's count, officers generally covered for each other and helped each other out: rather than reporting a fellow officer's error to the sergeant, officers would strike through the incorrect entry on the count sheet, correct it, initial it, and log it in as though it were a correct count. PSMF 197-99, 204-06.

However, beginning in around 2009, King's fellow officers departed from that standard practice and began scrutinizing and immediately reporting any errors King made to Sgt. Garrison. Two officers witnessed Sgt. Garrison expressly directing Ms. King's co-workers, including Officers Mason, Fenton, Mills, and Hatt, to "keep an eye on" King and report back to Garrison. PSMF 155, 221-223. Fourteen-year-veteran and union President Officer Dolan, who attended the disciplinary fact-finding hearings for all DCF employees including King, concluded based on his experience that King was being singled out for discipline. PSMF 218, 220. Officer Carney regularly observed King's male co-workers monitoring King and "trying to find her mistakes" and saw that King was being "held to a higher standard." PSMF 194, 226.[10]

---

[10] ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████

**Third**, contrary to Defendants' contention, King has presented evidence that DCF chose not to terminate similarly situated straight, male officers who committed similar or far more serious errors than King's routine count errors, including repeated count errors, covering up an inmate escape, and sleeping on the job. In order to establish pretext, the comparators need not be exact replicas of the plaintiff; instead, "[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases but be fair congeners.").

Multiple officers testified, and her annual performance evaluations demonstrate,[11] that King was very conscientious and competent in her work and had a good work ethic. PSMF 137-44. Officer Dolan conducted a line-by-line review of count records from around the time of King's termination and observed that King's errors were about average when compared to her fellow officers. PSMF 242. Based on Dolan's review and knowledge of the count records, he concluded that management could have disciplined most if not all of the corrections officers based on the same allegations they used against King, but chose not to. PSMF 243. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ s. Fifteen minutes into the next shift on that same date, King discovered that the prior shift's repeated counts, and her initial count of the same numbers, were all incorrect and self-reported the error, and yet King received a two-day suspension. PSMF 233-

---

for an employee. Mason attended the meeting on the Sergeant's request and did not say anything on King's behalf, even though as union steward he was charged with protecting employees, and even though King had not requested that Mason be there. PSMF 228-31.

[11] As Director Jones explained at his deposition, if King's counts had been deficient in a serious way, that would have been reflected in her annual evaluations, but it was not. PSMF 243.

34. In addition, DCF chose not to terminate several male DCF officers who routinely made illegible logbook entries. PSMF 247-48.

Defendants attempt to distinguish King's documentation errors from the routine documentation errors by other officers, labeling King's errors as serious count errors rather than "merely clerical errors." Motion at p.16. However, DCF corrections officers were not instructed or given any policies on a distinction between a so-called "clerical error" and a "count error." PSMF 207. █████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████ DSMF 85 (citing Garrison Aff., Exh. D). Although DCF used that error as a basis for termination, it could reasonably be viewed as a mere "clerical error" – in Defendants words, "inadvertently writing the wrong number when meaning to write another number." Motion at p.16.[12]

DCF likewise did not terminate straight, male officers who engaged in far more serious misconduct than the routine count errors King was alleged to have made. █████████████████

███████████████████████████████████████████████t. PSMF 256. █████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████,

---

[12] Defendants also attempt to distinguish King's documentation errors from others' on the basis that King did not discover and correct her own errors, but that distinction fails for two reasons. First, King disputes that she did not discover or self-correct any of the errors that DCF relied on for her termination. ████████████████████████████████████████ PSMF 233. Similarly, King testified that she discovered the January 16, 2011, error and immediately corrected and initialed the error as she had been trained to do. PSMF 236. Second, other male officers made count errors and did not immediately self-report or correct them and yet those officers were not terminated. ███████████████████████████████████████████

███████████████████████████████████████████ PSMF 233-34.

████████████████████████████████████████████████

████████████████████ . PSMF 256, 258. ██████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████ . PSMF 256- 259.

Sgt. Garrison also allowed a male co-worker of King to openly brag about abusing sick leave to go fishing, without any discipline. PSMF 260. And Captain Daniels imposed no discipline when a sergeant instructed an officer not to document or take any action in response to a prisoner's statement that "he would commit a suicide." PSMF 261.

In addition, DCF elected not to terminate multiple male officers and sergeants who were observed sleeping on the job, despite the clear public safety implications of such misconduct. PSMF 252-54. DCF likewise chose not to discipline or terminate two male officers on King's shift who left the facility premises to take hourly smoke breaks of up to 15 minutes at a time, even though those officers were unable to performing their basic job duties during those extended periods. PSMF 249-51.

**Fourth,** and finally, DCF's deviation from its standard discipline policy is further evidence of pretext. *Harrington,* 668 F.3d at 33. The progressive discipline policy governing King's employment set forth five stages of discipline: oral reprimand, written reprimand, suspension, demotion, and discharge. DSMF 120. Counseling, which is non-disciplinary, precedes the first-stage oral reprimand. PSMF 208, DSMF 52. Normally, when an employee has a counseling and a problem recurs, DCF proceeds to the oral reprimand. PSMF 208. However, in King's case, DCF jumped from a non-disciplinary counseling in January 2010 directly to imposition of a two-day suspension in January 2011. DCF's rush to suspend King, skipping over

both the oral and written reprimand steps, is a stark departure from its standard policy and practice.

### III.    There Are Genuine Issues Of Material Fact As To Whether DCF Terminated King In Retaliation For Her Complaints Of Disparate Treatment.

Contrary to Defendants' contention, a reasonable juror could conclude that King was terminated in retaliation for her complaints of disparate treatment based on (1) the suspicious timing of relevant events, and (2) the evidence calling into question DCF's proffered justification for terminating King.

**First**, as a factual matter, Defendants incorrectly assert that the disciplinary process had already begun when King first complained of disparate treatment. In 2009 or 2010, Union President Dolan reported to Captain Daniels, on King's behalf, that Dolan had heard Sgt. Garrison counsel King's male co-workers to keep an eye on King and report back to him. PSMF 222. Then, on January 17, 2010, on King's behalf Dolan questioned the counseling King had just received from Garrison, specifically noting that King felt "singled out" and "[o]ther officers have made similar mistakes and have not been brought to light by this writing and she is the only officer being counseled." PSMF 232. At the time of these complaints of disparate treatment, DCF had not initiated any disciplinary process against King for alleged miscounts, as "counseling is not considered a form of discipline." DSMF 52. Instead, DCF initiated formal disciplinary proceedings in November 2010, several months after King's first complaint that she was being singled out.

Moreover, as a legal matter, Defendants err in suggesting that Garrison's counseling of King prior to her February 2011 complaint, which was itself motivated by discriminatory animus, somehow immunizes DCF from liability for retaliation. The First Circuit has made clear that its "rulings do not hold that the existence of allegedly discriminatory employment actions

prior to the filing of a complaint immunizes an employer from a retaliation claim following the complaint." *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (finding temporal proximity to support retaliation claim where "all of the events described here took place within a period of about one year" and noting that "the [district] court may have overlooked the temporal closeness of events by focusing on the fact that [supervisor] had mistreated [employee] prior to her complaint.").

Here, the close timing of relevant events strongly suggests retaliatory animus. Garrison initiated discriminatory counseling in January 2010, at which point King complained that she was being singled out. Management administered further discriminatory disciplinary action in January 2011 and February 2011. At the disciplinary fact-finding hearing in February 3, 2011 based on King's alleged count errors on January 16, Officer Dolan expressly reported the concern to management that they were singling King out and writing her up because she was a woman and a lesbian. PSMF 237. On February 14, 2011, less than two weeks after Dolan reported King's concern that she was being singled out, Director Jones emailed Captain Daniels stating that they were "looking at . . . termination" of King. PSMF 238.

DCF has not contended, and the evidence does not support, that King's termination was a foregone conclusion prior to her February 3, 2011, complaint of disparate treatment. DCF did not routinely terminate non-probationary correctional officers, even when they had repeated infractions. Indeed, Director Scott Jones, the final decisionmaker responsible for King's termination, testified that during his tenure at DCF, the only non-probationary corrections officer he had ever terminated was King. PSMF 209. ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████." PSMF 234. ███████ r

16

██████████████████████████████████████████████

███████████████████████████████████████████

██████████." *Id.*

**Second**, for the same reasons discussed above, a reasonable juror could find DCF's justification for the firing were pretextual. See *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 32 (1st Cir. 2015) (reversing grant of summary judgment to employer on discrimination and retaliation claims, noting that the same "gaps and inconsistencies" in defendants' proffered justification supported both discrimination claim and retaliation claim).

### IV.    King's Section 1983 Claims Against David Garrison are Not Barred by Qualified Immunity.

The record is more than sufficient to support a jury finding that Garrison was strongly biased against King because she was a woman and a lesbian; fostered a hostile work environment for her for years; held her to a higher standard than all of her male co-workers; targeted her for unfair scrutiny and unfair discipline in order to get her fired; and submitted informational reports about her alleged count errors to his superiors that misled them about her relative performance and triggered her termination.[13]

Purposeful sex discrimination by a supervisor that results in hostile work environment and the eventual termination of a subordinate violates the clearly established constitutional rights of the subordinate to equal protection. *See, e.g., King v. Me. Dep't of Corr.*, 2015 U.S. Dist. LEXIS 58467 at *8 ("Individual supervisory officers who 'directly engaged in sexual harassment

---

[13] Defendants suggest that the information Garrison provided to his supervisors was not "false or misleading" because King did not dispute that the errors occurred. However, a reasonable juror could easily conclude that Garrison gave his supervisors "misleading" information by reporting all of King's routine count errors to management as if they were unique, but declining to report those same kinds of routine errors by King's male coworkers.

or sexual discrimination [are] subject to section 1983 liability.' *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 901 (1st Cir. 1988)), *objection overruled by* 2015 U.S. Dist. LEXIS 72136 (D. Me. June 4, 2015). To be held liable for any particular deprivation, the officer's conduct must have caused the alleged deprivation. *Id*. at 902.").[14] In addition, "before 2011, the First Circuit recognized supervisory liability for directly causing a constitutional deprivation" and thus qualified immunity does not shield Garrison for his actions of sex discrimination and free speech retaliation. *Id.* at * 16.

Here, contrary to Defendants' assertion that Sgt. Garrison had no influence on the decision to discipline and terminate King (Motion, p. 23), the evidence clearly demonstrates that Garrison's actions triggered King's discipline and termination. ██████████████████

████████████████████████████████████████

████████████████████████            s. DSMF ¶¶50, 54, 76, 83 (citing Garrison Aff. Exhs. A-D). Sgt. Garrison was the only supervisor with personal knowledge of King's performance because DCF supervisors higher in the chain of command, including Daniels and Jones, were virtually never on site during the night shift. PSMF 257. Sgt. Garrison knew that his criticisms of King's job performance would be accepted by Captain Daniels, because Daniels made it clear that he would stand behind his sergeants no matter what. PSMF 145. Director Jones himself testified that he and Captain Daniels "absolutely" had to rely on information from Garrison with regard to their "understanding of the performance of Kristin

---

[14] In addition, Garrison also violated King's clearly established constitutional right of free speech:  "A government employee should not suffer reprisal from a government official for engaging in protected speech because of the possible chilling effect against the free exercise of constitutional rights." *King v. Me. Dep't of Corr*, at *10 (quoting *Rosaura Bldg. Corp. v. Municipality of Mayagüez*, 778 F.3d 55, 66 (1st Cir. 2015)).

King" and that they were "largely" relying on Garrison's reports when they decided to fire King. *Id*.

### V.     The Union Arbitration Decision Has No Preclusive Effect Here.

**First**, the United States Supreme Court has held that in a Title VII case a court may not give a grievance arbitrator's decision either preclusive effect or deference. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36 (1974). Based on *Gardner-Denver*, Chief Judge Torresen recently rejected the employer's argument in an employment discrimination case that the arbitration decision in a union grievance of the same termination had "independent legal significance" because this claim was an "issue preclusion argument in disguise" and had no merit:

> In a case like this, where the arbitrator considered an employee's discrimination claim in the process of determining whether an employer had just cause to fire an employee, issue preclusion is foreclosed by *Gardner-Denver* and subsequent First Circuit precedent.

*Kirouac v. Donahoe,* 2013 U.S. Dist. LEXIS 158716 *25-26 (D. Me. Nov. 6, 2013)(citations omitted).[15]

**Second**, a grievance arbitration decision does not have preclusive effect in cases brought under Section 1983. The United States Supreme Court has squarely ruled that a federal court

---

[15] Chief Judge Torresen granted plaintiff's motion *in limine* to exclude the union grievance arbitration from evidence at trial. Specifically, this Court determined that the probative value of the arbitrator's decision was "not particularly high" and was "substantially outweighed" by the dangers of unfair prejudice, misleading the jury and waste of time that might result from its admission into evidence. *Id.* at *22-24. In addition, she expressed concern that "the jury may give special weight to the quasi-judicial conclusions of the arbitrator," that admitting the arbitration decision in evidence "would threaten the jury's independence of judgment on credibility," and that much time would be wasted in admitting the decision and then needing to allow the plaintiff to attack the decision's basis. *Id.* at *23-24.

may not "accord preclusive effect to an unappealed arbitration award in a case brought under [*42 U.S.C. § 1983*]." *McDonald v. City of West Branch*, 466 U.S. 284, 285, 287-88 (1984) (federal lawsuit bringing claims under Section 1983 following arbitration proceedings brought under union collective bargaining agreement); s*ee also Wilson v. Garcia*, 471 U.S. 261, 279 (1985) (Congress "intended that the remedy provided in § 1983 be independently enforceable whether or not it duplicates a parallel state remedy."). The Supreme Court has expressly re-affirmed its holding in *McDonald* that "arbitration of contract-based claims" cannot preclude subsequent judicial resolution of civil rights claims*,* subject to an exception that does not apply here. *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 263-64, 274 (2009) (arbitration decision is binding only when it arises from a "collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate" the civil rights claims at issue in the subsequently filed federal lawsuit); *see also Perry v. Larson*, 794 F.2d 279, 284 (7th Cir. 1986) (affirming in subsequent section 1983 action exclusion from evidence of arbitration decision upholding employee's termination).

## <u>Conclusion</u>

Based on the wide array of evidence that King's supervisor and all-male co-workers harassed, ostracized, undermined, and targeted her because she was gay and female and because she complained about this discrimination, a reasonable juror could readily find in King's favor on her claim based on a hostile work environment and based on her termination. Therefore, Defendants' motion for summary judgment should be denied in full.

Date:   February 26, 2015                    Respectfully submitted,


                                             /s/ David G. Webbert
                                             David G. Webbert, Esq.
                                             Carol J. Garvan, Esq.
                                             Johnson, Webbert & Young, L.L.P.
                                             160 Capital Street, P.O. Box 79
                                             Augusta, Maine 04332-0079
                                             (207) 623-5110
                                             dwebbert@johnsonwebbert.com
                                             cgarvan@johnsonwebbert.com

                                             *Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that on February 26, 2016 I electronically filed this filing with the Clerk of Court using the CM/ECF system and emailed a copy to the following:

    Kelly L. Morrell, Assistant Attorney General
    kelly.l.morrell@maine.gov


Date:   February 26, 2016               /s/ David G. Webbert