# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **KRISTIN A. KING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **1:13-cv-00163-JDL** |
| | ) | |
| **STATE OF MAINE,** | ) | |
| **DEPARTMENT OF** | ) | |
| **CORRECTIONS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## *ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Kristin A. King was employed as a correctional officer at the Downeast Correctional Facility ("DCF") from September 2004 until her termination in September 2011. ECF No. 41 at 1, 3, 10 (First Amended Complaint). At the time she was terminated, King was the only female and the only openly gay uniformed officer working at the facility. ECF No. 73 at 2. King brings this action against her former employer, the State of Maine, Department of Corrections, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.* (2016), and Title I of the Civil Rights Act of 1991, 42 U.S.C.A. § 1981a (2016), and the Maine Human Rights Act, 5 M.R.S.A. §§ 4551-4634 (2016), by (1) subjecting her to intentional discrimination based on her sex and sexual orientation; (2) subjecting her to a hostile work environment on the basis of her sex and sexual orientation; and (3) retaliating

---

* This opinion is **SEALED** until 5:00 p.m. on Friday, July 15, 2016, to give the parties an opportunity to notify the Court, by sealed filings, whether any portion(s) need to be redacted because of confidentiality restrictions.

against her in response to her charge of discrimination.   ECF No. 41 at 3, 11.[1]   King also sues her former supervisor, David D. Garrison, under 42 U.S.C.A. § 1983 (2016), alleging that he deprived her of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.  ECF No. 41 at 3, 12-13.

The Department and Garrison seek summary judgment on all of King's claims pursuant to Federal Rule of Civil Procedure 56.  ECF No. 64.  For the reasons I will explain, I deny their motion.

## I.  FACTUAL BACKGROUND

During the period of King's employment as a correctional officer, the DCF was a minimum to medium security prison with approximately 150 male inmates.  ECF No. 64 at 2.  King's annual performance evaluations were positive and offered praise as to how she performed her duties.  ECF No. 83 at 41-42, ¶¶ 137-39.[2]  The most recent and final evaluation was completed in October 2010 and was signed by Garrison, who was then a sergeant at the facility.  *Id.* at 3, ¶ 15 and 42, ¶ 138.

In January of 2010, King received a formal written counseling slip from Garrison for two errors that she made during a single shift in connection with the inmate count.  *Id.* at 14-15, ¶¶ 50-51.   King admits that she neglected to take a formal count after a mass movement of inmates in one of the dorms, and that during

---

[1]  The parties stipulated to a dismissal of King's disability-related claims with prejudice and without costs.  ECF No. 91.

[2]  ECF No. 83 is the parties' consolidated statement of material facts.  It is a sealed document and therefore not available to the public on the case docket.  The parties' joint amended stipulated record (ECF No. 84-1 through 84-5) is likewise sealed.  Other filings in this case, including the parties' briefs and statements of material facts, have a sealed, unredacted version and a public, redacted version.  This Order cites to the public version of a document where feasible but contains a number of references to filings that do not appear on the publicly available docket.

the same shift, she made an error in recording a count for another dorm. *Id.* at 15, ¶ 51. A counseling slip is not considered to be a form of discipline, but is instead a means of improving an employee's job performance. *Id.* at 15, ¶ 52.

During her shift on November 10 and 11, 2010, King made multiple errors related to the inmate count. *Id.* at 16, ¶¶ 54-55; ECF No. 60-7 at 14. The errors were discovered by another officer; they were reported to Garrison and one error was reported to a sergeant, Darrell Daniels, who was not her direct supervisor and resulted in the facility undertaking an emergency count. ECF No. 83 at 16-17, ¶¶ 58-59 and 18, ¶¶ 65-66.[3] A disciplinary fact-finding hearing regarding the November 10 and 11 errors was conducted by Colonel David Daniels, the Chief of Security, on November 30, 2010. *Id.* at 18, ¶ 68. Although King did not dispute that she had committed the errors, her union representative asserted that King was being unfairly singled out for discipline. *Id.* at 22, ¶ 69. Following the fact-finding hearing, the facility's director, Director Scott Jones, suspended King for two shifts. *Id.* at 23, ¶ 71. The union did not grieve King's suspension under the collective bargaining agreement. *Id.* at 24, ¶ 74.

On January 16, 2011, King committed an error in an inmate count. *Id.* at 24-25, ¶¶ 76-80.[4] The parties dispute how the error was discovered and corrected. *See*

---

[3] Sergeant Darrell Daniels reported the errors by King and by two officers on the preceding shift to Colonel David Daniels. ECF No. 83 at 18, ¶ 66 (citing ECF No. 84-4 at 106, ¶ 10 and 112, ¶ 35). Garrison also reported the errors to Colonel Daniels, in a report dated November 21, 2010. *See id.* at 34, ¶ 119 (response) (citing ECF No. 84-4 at 183, ¶ 20; ECF No. 84-5 at 2).

[4] Garrison reported the error to Colonel Daniels. *See* ECF No. 83 at 34, ¶ 119 (response) (citing ECF No. 84-4 at 183, ¶ 22; ECF No. 84-5 at 3).

*id.* The Department contends that Garrison discovered the error and that after he questioned King, she inappropriately changed the count sheet without having first conducted a required verification count. *Id.* at 24-25, ¶¶ 76, 78, 79. King contends that she discovered her error and immediately corrected and initialed the error as she had been trained to do. *Id.* at 24, ¶ 76 (response). A fact-finding hearing related to the error was held by Colonel Daniels on February 3, 2011. *Id.* at 25-26, ¶ 81. On February 8, before a decision was issued, King committed another error in recording inmate counts. *Id.* at 27, ¶¶ 83, 85. Garrison reported the error to Colonel Daniels. *Id.* at 27, ¶ 88 (citing ECF No. 84-4 at 184, ¶ 31; ECF No. 84-5 at 4). A fact-finding hearing regarding the February 8 error was scheduled for February 14, and then rescheduled for February 28, but, as will be explained, was not held until September 8. *Id.* at 28-29, ¶¶ 89, 92 and 33, ¶ 115.

King claims that she "began to experience significant stress and anxiety in 2011 as a result of management singling her out and treating her differently than other officers." *Id.* at 77, ¶ 239. On February 11, 2011, King called in sick and delivered a doctor's note to the Department stating that she could not work through February 16. *Id.* at 28-29, ¶¶ 90-91. On February 16, King called the facility's director and told him that she had another doctor's note stating that she could not work until further notice. *Id.* at 29, ¶ 94. King was placed on family medical leave from February 13 through May 11, 2011. *Id.* at 29, ¶ 96.

In mid-March, the Department received an M-1 workers' compensation form that stated that King could return to work with the following restrictions: "minimally

stressful work environment, low auditory, low visual, low stimulation area such as solitary confinement." *Id.* at 29, ¶ 97. There were, however, no positions available at the facility that would guarantee that these restrictions were met. *Id.* at 30, ¶ 98. Ultimately, King was placed on an unpaid medical leave of absence beginning on May 12, 2011. *Id.* at 31, ¶ 105. She was advised of her right to request an accommodation under the Americans with Disabilities Act ("ADA") and was provided the required paperwork, as well as the required paperwork for an unpaid sick leave of absence pursuant to the union's collective bargaining agreement. *Id.* at 31, ¶¶ 104, 107. King did not return the ADA paperwork. *Id.* at 32, ¶ 109.

In June 2011, King wrote to the Department stating that she could return to work in a light-duty capacity in the Main Control office, and in August her health care provider wrote that she was able to return to work in the Main Control office. *Id.* at 32, ¶¶ 111, 113. Because of the pending disciplinary proceedings related to the January 16 and February 8 count errors, the Department wrote to King on August 31, 2011, to advise her that she was being placed on paid administrative leave pending the completion of the fact-finding hearing previously scheduled for February 28. *Id.* at 32-33, ¶ 114. King filed a charge of discrimination with the Maine Human Rights Commission on June 30, 2011, and the Department became aware of it in August 2011. *Id.* at 40-41, ¶ 133.

The fact-finding hearing related to the February 8 errors was held on September 8, 2011. *Id.* at 33, ¶ 115. Neither King nor her union representative disputed the facts or the record regarding her February 8 count errors, but both King

and the union representative again asserted that King was being singled out for discipline because of her sex and sexual orientation. *Id.* at 33, ¶ 116; ECF No. 84-4 at 152. Following the fact-finding hearing, the facility's director terminated King's employment on September 20, 2011. ECF No. 83 at 33, ¶¶ 117-18. The union grieved King's termination under the collective bargaining agreement, but the arbitrator found that the Department had just cause to terminate King's employment and that the union had failed to prove that King was treated differently or less favorably than other correctional officers with histories similar to King's. *Id.* at 39-40, ¶¶ 127-28, 130-31.

## II. SUMMARY JUDGMENT STANDARD

### A.     Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'" *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has potential to determine the outcome of the litigation." *Id.* (citing *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S.

317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Johnson*, 714 F.3d at 52.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (citing *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006)) (internal quotation marks and emphasis omitted); Fed. R. Civ. P. 56(c). "[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (internal quotation and citation omitted).

## B.   Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id.*  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or

qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own statement of additional material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts, in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## III. LEGAL ANALYSIS

**A.     The Defendants' Motion for Summary Judgment**

### 1. Intentional Discrimination

King asserts that the Department discriminated against her on the basis of her sex and sexual orientation by disciplining and ultimately firing her for inmate count errors that would not have resulted in discipline and termination if committed by her male co-workers.  ECF No. 73 (71-1) at 8 & n.8, 11-13.

Under the *McDonnell Douglas* burden-shifting framework that governs the allocation of the burden of production and order of proof in Title VII disparate treatment discrimination cases, King is required to first demonstrate a *prima facie* case of discrimination.  *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93 (1st Cir. 2012).  This consists of proof that (1) she is a member of a protected class; (2) who was qualified for her job; (3) against whom her employer took an adverse employment action; and (4) her position remained open or was filled by a person with similar qualifications.  *Id.*

The Department contends that King cannot establish a *prima facie* case, because of "her undisputed performance deficiencies."  ECF No. 64 (63-1) at 16.  Assuming that this argument relates to the second *prima facie* element that King was qualified for her job, the material facts regarding King's workplace performance that resulted in her discipline and firing are largely disputed.  Although King admits to having made count errors, she also asserts that such errors occurred regularly at the facility and that her errors were no more egregious than those committed by her

9

male co-workers who were not disciplined or terminated.  *See* ECF No. 83 at 63, ¶¶ 202-03 and 66, ¶ 209 and 74-76, ¶¶ 233-35 and 78-80, ¶¶ 242-44.  The Department disputes most of these assertions, *see id.*, and argues that the errors that King made with respect to counts were distinct from and more serious than "clerical errors" and that count errors made by other officers were reported and disciplined, *id.* at 61, ¶ 195 (response) and 68, ¶ 216 (response) and 78-80, ¶¶ 242-44 (responses).  However, viewing the summary judgment record in the light most favorable to King and drawing all reasonable inferences in her favor, as I must, there is sufficient proof that King satisfies the second required *prima facie* element related to her qualification for her job.

Because King has made a *prima facie* case, the burden of production shifts to the Department to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  "If the defendant produces such evidence, the *McDonnell Douglas* framework 'disappear[s]' and the sole remaining issue is 'discrimination *vel non*.'"  *Cham*, 685 F.3d at 94 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983))).  The ultimate burden of persuasion remains on King, who must demonstrate that the reasons offered by the Department were a pretext for discrimination.  *Id.* (citations omitted); *see also Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 447-48 (1st Cir. 2009).

The Department has satisfied its burden of producing evidence that King was disciplined and terminated for a legitimate, nondiscriminatory reason. King's discipline and firing were tied to inmate count errors that King made between November 10, 2010, and February 8, 2011. ECF No. 64 (63-1) at 16. Accordingly, the Department has satisfied its burden of production, and the ultimate burden of persuasion rests with King to demonstrate that the reasons offered by the Department were a pretext for discrimination.

King's proof of pretext rests on her claim that she was unfairly targeted for discipline and, ultimately, termination because of a widely held belief at the facility that a woman should not be permitted to work there as a correctional officer, as well as hostility toward her sexual orientation. King contends that inmate count errors were a common occurrence at the DCF, that every officer made count errors, that she was held to a higher standard for her performance than were her co-workers, and that, unlike her, male officers were not disciplined for count errors. ECF No. 83 at 61-62, ¶¶ 194-99 and 63, ¶¶ 202-03. She asserts that when a correctional officer discovered an error in a fellow officer's count, officers generally covered for each other and that rather than report the error to a sergeant, they would correct the error and initial it. *Id.* at 63-64, ¶¶ 204-05 (citing ECF No. 60-3 at 13; ECF No. 60-7 at 12). King contends that once the decision was made to target her as early as 2009, her fellow officers began to scrutinize her counts and report all of her errors to Garrison. *Id.* at 47-48, ¶ 155 and 70-71, ¶¶ 221-23. Two officers witnessed Garrison direct King's co-workers to "keep an eye on" King and report back to him. *Id.* at 70-71, ¶¶

221-23.  One officer observed King's male co-workers monitoring her, "trying to find her mistakes[,]" and that King was "held to a higher standard[.]"  *Id.* at 61, ¶ 194 and 72, ¶ 226.  King asserts that other male correctional officers "made as many or more of the same types of count errors that King did and were not terminated."  *Id.* at 79, ¶ 244.  King also contends that in November 2010 male officers committed the same count errors that she made during the shift that immediately preceded hers, and they were only given verbal counseling while she was suspended without pay.  ECF No. 60-3 at 15; ECF No. 60-7 at 14, 15; ECF No. 83 at 74-75, ¶¶ 233-34.

As I stated before, the preceding facts are largely disputed.  Yet, if a jury were to resolve those disputes in favor of King, it could reasonably conclude that the Department's stated legitimate, nondiscriminatory reason for King's discipline and termination was pretext for discrimination based on King's sex or sexual orientation. Therefore, the Department is not entitled to summary judgment on King's disparate treatment claim.

### 2. Hostile Work Environment

To establish a claim of hostile work environment based on sex or sexual orientation,[5] a plaintiff must demonstrate that (1) she is a member of a protected

---

[5] Title VII "does not proscribe harassment simply because of sexual orientation."  *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999).  "Rather, the plaintiff must show that the discrimination is based upon other prohibited characteristics, such as race or sex."  *Tinory v. Autozoners*, 2016 WL 320108, at *4 (D. Mass. Jan. 26, 2016) (citing *Centola v. Potter*, 183 F. Supp. 2d. 403, 408 (D. Mass. 2002)).  Discrimination on the basis of sexual orientation is actionable under the MHRA.  *See* 5 M.R.S.A. § 4552; *see also Doe v. Reg'l Sch. Unit 26*, 2014 ME 11, ¶ 12, 86 A.3d 600.  In this case, because King brings discrimination claims under both Title VII and the MHRA, and "[b]ecause courts typically apply Title VII standards to claims of sexual harassment under the MHRA," *Higgins*, 194 F.3d at 258 n.2 (citing *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 n.3 (1st Cir. 1997)); *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1053 (Me. 1992), I analyze jointly the claims of discrimination based on sex and sexual orientation.

class; (2) she was subject to unwelcome harassment; (3) the harassment was based upon sex or sexual orientation; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment; (5) the objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim did in fact perceive it to be so; and (6) some basis for employer liability has been established. *See Forrest v. Brinker Int'l Payroll Co., LP,* 511 F.3d 225, 228 (1st Cir. 2007); *see also Watt v. UniFirst Corp.,* 2009 ME 47, ¶ 22, 969 A.2d 897. "In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) (citation omitted).

King's hostile work environment claim is based on her allegations, which are disputed by the defendants, that: (1) Garrison made derogatory comments about her sex and sexual orientation,[6] and her male co-workers regularly used derogatory slurs such as "homo," "fag," and "dyke," ECF No. 73 at 4; ECF No. 74 (71-2) at 41-42, ¶¶ 150-51, 153-54, 156-57, and expressed hostility toward gay people, ECF No. 74 (71-2)

---

[6] Among other things, King contends that "Sgt. Garrison regularly demeaned King because of her sex and sexual orientation, stating in front of other officers that King was incapable of doing the job and that there was 'nothing they could do because she was a lawyer's dream, being a female, a lesbian and a midget[.]'" ECF No. 73 at 4; *see* ECF No. 74 at 41, ¶ 151.

at 42, ¶¶ 158-62; (2) pornographic magazines were constantly present in the staff areas of the facility, ECF No. 73 at 5; ECF No. 74 (71-2) at 45, ¶¶ 180-83, and there were derogatory comments about her sexual orientation written on magazines left around the facility, ECF No. 74 at 43, ¶ 163; (3) King was "kind of shut out" and "couldn't go to other officers for help without being mocked or without being given erroneous information or be led astray or made to look foolish," ECF No. 73 at 5; ECF No. 74 (71-2) at 46-47, ¶¶ 191-93, 196; (4) King was excluded from the regular after-work socializing that her co-workers engaged in, ECF No. 74 (71-2) at 43, ¶¶ 165-67; (5) there was a "widely shared" belief at the facility that women should not be permitted to work there, *id.* at 44, ¶¶ 172-73; and (6) King was targeted by Garrison and her male co-workers for heightened scrutiny and discipline, ECF No. 73 at 5; ECF No. 74 (71-2) at 18-21, ¶ 68 (response) and 42, ¶ 155 and 50, ¶¶ 214-16 and 51, ¶¶ 220-26;[7] *see* ECF No. 60-7 at 17; ECF No. 60-1 at 13, 14-15.  As to this last allegation, one of King's co-workers testified to having been present when another co-worker, who was a union steward, expressed to Garrison and others his belief that King "should not be there and that they should have gotten rid of her when they had the chance and she was on probation."  ECF No. 60-1 at 14.  The union steward then allegedly told Garrison that because of King's favorable performance evaluations, they needed to document her negative performance:  "He made comments that, you

---

[7]  Based on my examination of the Deposition of James Dolan, ECF No. 60-3, the Department's and Garrison's request to strike Plaintiff's Statements of Material Fact numbers 178 (first sentence only) and 179 is **GRANTED**, and their request to strike Plaintiff's Statement of Material Fact number 220 is **DENIED**.  *See* ECF No. 81.

know, every time she does anything negative it needs to be put in her file, and she needs to be counseled." *Id.* at 15.

The Department disputes much of King's factual assertions that portray the facility as a hostile work environment. For example, the Department argues that officers did report errors by officers other than King and that the practice of correcting an error and initialing it could be done with "clerical error[s]," which were distinct from "count error[s]," the type of errors that King made. *See* ECF No. 83 at 63-65, ¶¶ 204, 206-07 (responses) and 68, ¶¶ 215-16 (responses). In addition, the Department argues that, with one inconsequential exception, it is undisputed that King did not personally witness any derogatory slurs by her supervisor and co-workers, and that she relies instead on the testimony of two other correctional officers who testified to conversations and events at which King was not present. ECF No. 78 at 2. Further, the Department asserts that King admitted that during her nearly seven years of employment, she never once complained to anyone in management about the presence of pornographic magazines in the non-inmate areas, although King claims that she reported her discomfort to her union representative. ECF No. 64 at 3 (citing ECF No. 65 at 4, ¶¶ 23-25). The Department also asserts that King was seen by co-workers reading adult magazines and was observed drawing pictures of nude women while on duty. *Id.* (citing ECF No. 65 at 4, ¶¶ 26, 28). King denies these last allegations. ECF No. 74 at 7, ¶¶ 26, 28.

A hostile work environment claim requires proof that the challenged conduct was both objectively and subjectively offensive so that a reasonable person would find

it hostile or abusive, and further, that the victim did in fact perceive the conduct to be hostile or abusive.  *Forrest*, 511 F.3d at 228.  "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  *Cottrill v. MFA, Inc.*, 443 F.3d 629, 636 (8th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)) (internal quotation marks omitted).  King testified that she never personally heard anyone make derogatory or negative comments about her gender or sexual orientation, other than the single comment made at the outset of her employment.[8]  ECF No. 83 at 45-46, ¶ 150 (response) and 47, ¶ 153 (response) (citing ECF No. 60-7 at 5-6, 10).  King also testified that no one told her about the derogatory comments at the time they were made.  *Id.* (citing ECF No. 60-7 at 6).

The Department argues that King cannot rely upon evidence of harassment that did not occur in her presence and she only discovered later.  *See* ECF No. 78 at 2.  The law is clear that a victim must subjectively perceive the environment to be abusive, *Harris*, 510 U.S. at 21-22; *Billings v. Town of Grafton*, 515 F.3d 39, 47 (1st Cir. 2008), and therefore, the victim must be aware of the hostility.  "A Title VII plaintiff 'may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment.'"  *Cottrill*, 443 F.3d at 636 (quoting *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777,

---

[8]  This refers to a comment by a male co-worker to King, shortly after she started working at the DCF, that he did not feel that female officers should be working at a male prison.  ECF No. 83 at 52, ¶ 171.

782 (10th Cir. 1995), *abrogated on other grounds by Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

Accordingly, if King's hostile work environment claim rested solely on evidence of derogatory comments that were not made in her presence and that she was unaware of, her claim would fail. However, evidence of the comments must be considered in conjunction with the other evidence that King asserts in support of her claim, beginning with her awareness from as early as 2009 that she was being singled out for workplace discipline and that there was a widely-shared belief at the facility that women should not be permitted to work there. *Cf. Xiaoyan Tang v. Citizens Bank, N.A.*, 2016 WL 2946379, at *5 (1st Cir. May 19, 2016).[9] Evidence of the derogatory comments may, therefore, be relevant to explain why, as King claims, she was subjected to heightened scrutiny and disciplined for workplace errors that would not have resulted in discipline if committed by a male correctional officer. *See O'Rourke*, 235 F.3d at 730 (recognizing that "incidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment" and constitute harassing conduct).

Although it is a close call, the summary judgment record, viewed in the light most favorable to King as the nonmoving party, does not support the entry of

---

[9] Assessing the evidence in support of the plaintiff's claim of sexual harassment, including comments by her supervisor that "lack[ed] any sexual content[,]" the First Circuit stated, "The context in which something is said may be just as important as what is said." *Xiaoyan Tang*, 2016 WL 2946379, at *5 (citing *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001) ("Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct.")).

summary judgment for the Department on King's claim of a hostile work environment based on sex or sexual orientation.[10]

### 3. Retaliation

The Department asserts that King cannot establish that she was disciplined and then terminated for her complaints of discrimination because the disciplinary process with regard to the January 2011 inmate count errors had already been initiated before King raised her disparate treatment concerns at the February 3, 2011, fact-finding hearing.  ECF No. 64 (63-1) at 20.  The Department also asserts that King was disciplined for repeated serious errors related to the inmate count, and not simple clerical errors, and that she "cannot show that she would not have been disciplined or terminated 'but for' her protected activity."  *Id.*

To establish her claim of retaliation, King must show that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment

---

[10]  The Department argues in a footnote that "[i]f the alleged harassment is considered harassment by supervisors, DCF is entitled to the *Faragher/Ellerth* affirmative defense as a matter of law."  ECF No. 64 at 12-13 & n.2.  The Supreme Court has held that "[w]hen no tangible employment action is taken," an employer subject to vicarious liability "for an actionable hostile environment created by a supervisor" may raise an affirmative defense to liability or damages if it establishes that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher*, 524 U.S. at 807.  "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."  *Id.* at 808 (citation omitted); *Arrieta-Colon v. Wal-Mart P.R., Inc.*, 434 F.3d 75, 86 (1st Cir. 2006).  Here, there was a tangible employment action—King was disciplined and then terminated—and there is a factual dispute as to whether these actions resulted from Garrison's conduct.  *See Agusty-Reyes v. Dep't of Educ. of P.R.*, 601 F.3d 45, 53 (1st Cir. 2010) ("If [the supervisor's] actions could be found to have resulted in tangible employment action, the [employer] would be liable, and no affirmative defense would be available."); *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 43-44 (1st Cir. 2003).  There is also a factual dispute as to whether the Department exercised reasonable care to prevent or correct the alleged harassing behavior.  *See* ECF No. 64 at 12-14 & n.2; ECF No. 73 at 7-8 & n.6.

action.  *Valle-Arce v. P.R. Ports Auth.,* 651 F.3d 190, 198 (1st Cir. 2011). Chronological proximity alone will not establish causality, particularly if the "larger picture undercuts any claim of causation[.]" *Wright v. CompUSA, Inc.,* 352 F.3d 472, 478 (1st Cir. 2003) (internal quotation marks and citation omitted).  If the Department then proffers a legitimate, nonretaliatory reason for her termination, King must then "adduce some significantly probative evidence showing both that the proffered reason is pretextual and that a retaliatory animus sparked [her] dismissal." *Higgins*, 194 F.3d at 262 (citation omitted).  To prevail on her retaliation claim, King must establish but-for causation, that is, that the alleged unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the Department.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2533 (2013).

King contends that her termination by the Department was in retaliation for her complaints of disparate treatment and that her complaints began well before the February 3, 2011, fact-finding hearing.  ECF No. 73 at 15.  The first complaint that King cites was made in 2009 or 2010 on her behalf by union president James Dolan to Colonel Daniels, when Dolan reported that King's fellow officers were being counseled to watch her.  *Id.* (citing ECF No. 83 at 71, ¶ 222 (citing ECF No. 60-3 at 7)); *see also* ECF No. 83 at 70-71, ¶ 221 (citing ECF No. 60-3 at 6).  King claims that Dolan made a similar complaint on King's behalf on January 17, 2010.  ECF No. 73 at 15 (citing ECF No. 83 at 74, ¶ 232).  In a handwritten memorandum dated January 17, 2010, signed by both Dolan and King and addressed to Sergeant Garrison, Captain Daniels, and Director Jones, Dolan wrote:  "It is Officer King['s] belief and

impression that she is being singled out and she doesn't understand why. Other officers have made similar mistakes and have not been brought to light by this writing and she is the only officer being [counseled]." ECF No. 84-5 at 88-89. At the February 3, 2011, fact-finding hearing, Dolan asserted that King was being singled out for discipline because she was a woman and a lesbian. ECF No. 83 at 26-27, ¶ 82 (response).

Under King's version of the disputed material facts, her claim of disparate treatment was reported twice prior to the February 3, 2011, fact-finding hearing. Thus, contrary to the Department's position, there is a factual dispute as to whether the disciplinary process was already underway before King or someone on her behalf first communicated her belief that she was being unfairly targeted.

The Department also contends that King cannot demonstrate that she would not have been disciplined or terminated but for her reports of disparate treatment because of the severity of the inmate count errors that she made. *See* ECF No. 64 (63-1) at 20. However, King was the only non-probationary correctional officer ever terminated by Director Jones, ECF No. 83 at 66, ¶ 209, and King asserts that her alleged count errors were comparable to those of her fellow officers and that male officers who made as many or more of the same types of count errors as King did were not terminated, though the Department disputes these assertions. *See id.* at 78-80, ¶¶ 242-44. Further, King asserts that on November 11, 2010, the same day on which King admits to having made inmate count errors, she identified inmate count errors made by the male officers who had worked the previous shift, and that she reported

20

both her own and the previous shift's errors to the control officer.  *Id.* at 74, ¶ 233; ECF No. 60-7 at 14, 15.  She asserts that:

> The male officers who missed the approximately five counts on the prior shift and left for the day without ever catching their mistake were only given oral counselings while King was suspended without pay, even though one of the officers . . . had "horrible penmanship," a long history of inmate count errors and illegible entries in official records, and had problems with being "unprofessional on the radio."

ECF No. 83 at 75, ¶ 234.  These disputed facts,[11] related to the possible disparate treatment of King and the male officers who worked the preceding shift on November 11, 2010, provide a basis upon which a jury might reasonably conclude that retaliation was the but-for cause of King's discipline and termination.

The Department, again asserting that King's first protected activity took place on February 3, 2011, when she first raised the concern to management that they were singling her out because she was a woman and a lesbian, cites that at that point King already had a suspension as a result of the November 2010 errors and a reported error on January 16, 2011.  ECF No. 78 at 7.  However, even if some of the alleged performance for which King was terminated occurred prior to her first protected activity, as the Department identifies it, there are two possible reasonable inferences that can be drawn: first, that King's errors and poor performance were the reason for

---

[11]  In responding to Plaintiff's Statement of Material Fact ("PSMF") 234, the Department asserts that "[t]here is no evidence in the record that [the officer] who worked on day shift . . . had a 'long history of inmate count errors' or 'illegible' entries."  ECF No. 83 at 75-76, ¶ 234 (response).  That portion of PSMF 234 is supported by a record citation to King's interrogatory answers, ECF No. 84-2 at 48.  Although King worked the shift immediately following that officer, she would have had access to his inmate count entries and, as she claims was true on November 11, 2010, could have been in a position to identify the officer's errors and the legibility of his handwriting on that day.  Accordingly, there is record support for the fact asserted in PSMF 234.  Further, deposition testimony of Director Scott Jones, also cited in PSMF 234, also provides support that the officer had handwriting and count-related issues.  ECF No. 84-3 at 108.

her termination, or second, that they were pointed to as grounds for termination but were pretext and King's complaints were the actual reason for the termination.  *See Xiaoyan Tang*, 2016 WL 2946379, at *9-10 (finding that two competing inferences could be drawn from evidence that the plaintiff had performance issues long before she submitted her complaint to human resources: one, that human resources was investigating a basis for her complaint and she was fired for poor performance and another, that following her complaint, the employer was looking for a basis on which to fire her and the stated reason for her termination was pretext).

Accordingly, summary judgment is not appropriate on King's claim of retaliation.

### 4.  Qualified Immunity

Garrison asserts that he is entitled to qualified immunity as to King's § 1983 claims, which allege that he, "while acting under color of state law, violated the constitutional rights of Officer King, including the [Fourteenth Amendment] rights to be free of discrimination based on sex and sexual orientation and the First Amendment right to engage in speech reporting and opposing unlawful discrimination without retaliation."  ECF No. 41 at 12.

Public officials sued for money damages in their individual capacities under § 1983 are entitled to qualified immunity unless (1) the facts alleged demonstrate that the individual defendant's conduct violated a statutory or constitutional right, and (2) the contours of that right were "clearly established" under then-existing law so that a reasonable official would have known that her or his conduct was unlawful.

*Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011); *Morales v. Chadbourne*, 793 F.3d 208, 214 (1st Cir. 2015). As to the second element, the contours of a right are "clearly established" when, at the time of the challenged conduct, they are "sufficiently clear that every reasonable official would . . . underst[and] that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (internal quotation marks omitted); *Morales*, 793 F.3d at 214.

Accordingly, to defeat Garrison's assertion of qualified immunity, King must show that Garrison's conduct violated her constitutional right and that the right was "clearly established" at the time of the conduct. *Ashcroft*, 563 U.S. at 735. Here, the alleged wrongful conduct is discrimination based on sex and sexual orientation and retaliation for protected conduct.[12] King has provided record support, with all reasonable inferences in her favor, for her assertion that (1) Garrison's reports were motivated by discriminatory animus and (2) the reports regarding her inmate count errors would not have been made except for the fact that King was a lesbian woman. *See* ECF No. 83 at 19-22, ¶ 68 (response) and 61, ¶¶ 194-95 and 70-72, ¶¶ 221-26. Garrison argues, however, that qualified immunity applies if it is shown that the information provided to the decisionmaker by a discriminating or harassing supervisor was true, although he cites no authority that directly supports this proposition. *See* ECF No. 64 (63-1) at 23-25. In any event, the truthfulness of the

---

[12] Garrison invokes at length the "cat's paw" theory. *See* ECF No. 64 (63-1) at 22-25. He contends that even as of the First Circuit's 2015 decision in *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63 (1st Cir. 2015), it was not clearly established whether an employer is liable if a supervisor, acting with discriminatory animus, reports accurate information, resulting in the employee's termination. *See* ECF No. 64 (63-1) at 24. However, the "cat's paw" theory is a basis for employer liability for discrimination. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *Ameen*, 777 F.3d at 70. Applied here, the "cat's paw" theory does not control the issue of Garrison's individual liability under § 1983.

information that Garrison reported is not determinative because a jury might conclude that the reports were misleading and, therefore, false, because they treated routine inmate count errors as unique and serious violations of the Department's standards worthy of discipline, but Garrison "declin[ed] to report those same kinds of routine errors by King's male coworkers."  ECF No. 73 (71-1) at 17 & n.13; *see* ECF No. 83 at 10-11, ¶ 36 (response) (citing ECF No. 60-11 at 12, 13; ECF No. 60-7 at 13), and 36, ¶ 123 (response) (citing ECF No. 60-1 at 6).  King also asserts, with record support, that "Garrison knew that his criticisms of King's job performance would be accepted by Captain Daniels and Director Jones[,]" that Daniels and Jones had no personal knowledge about King's job performance, and that both were "'largely' relying on . . . Garrison's reports when they decided whether [King] should be terminated or not."  ECF No. 83 at 44, ¶ 145 (citing ECF No. 60-1 at 8; ECF No. 60-6 at 3).

In *Tejada-Batista v. Morales*, 424 F.3d 97, 101-03 (1st Cir. 2005), the First Circuit upheld the liability of two supervisors who, with an unlawful retaliatory motive, passed on accurate information about the plaintiff's criminal conviction and a recommendation that he be discharged.  The information and recommendation led to the plaintiff's termination by a superior who, with a nondiscriminatory motive, acted on the information.  *Id.* at 101-02.  The court affirmed the jury verdict and award of damages against the supervisors, reasoning that even assuming that the superior's motive was innocent, "a jury could reasonably doubt that the firing would have occurred" if the superior had come across the information on his own.  *Id.* at 102.

24

Accordingly, King has produced sufficient evidence to create a genuine issue of material fact as to the first element of qualified immunity: whether Garrison violated her rights.  A reasonable jury could conclude that Garrison targeted her because of her sex or sexual orientation by directing others to report, and then reporting, King's errors, leading to her firing for errors that did not give rise to serious discipline or termination when committed by male officers.

The second qualified immunity element addresses whether the contours of the right that King asserts were sufficiently clear in 2011 at the time of the alleged unlawful conduct.  Here, King alleges a deprivation of her Fourteenth Amendment right of equal protection by unlawful sex discrimination and retaliation.[13]  In 2011, it was established in this Circuit that a supervisory official who directly engages in sexual harassment or sexual discrimination against a subordinate employee is subject to § 1983 liability.  *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 901 (1st Cir. 1988).  In addition, and as just discussed, it was also established that a supervisor who, with an unlawful retaliatory motive, passes on accurate information and a recommendation to discharge a subordinate, may face § 1983 liability.  *Tejada-Batista*, 424 F.3d at 101-03; *see also Do Corp. v. Town of Stoughton*, 2013 WL 6383035, at *11 (D. Mass. Dec. 6, 2013).  Accordingly, the contours of the right that King asserts in this action were sufficiently clear in 2011 to support the possibility of § 1983 liability here.

---

[13] With respect to King's § 1983 claim based on the alleged violation of her First Amendment rights by retaliation for protected speech, Garrison has not specifically challenged whether the contours of the right were clearly established at the time of the conduct, *see* ECF No. 64; ECF No. 78, and I therefore do not address the issue.

For the foregoing reasons, I conclude that Garrison is not entitled to summary judgment based on qualified immunity.

### 5.  Arbitration Decision

The Department asserts that King is bound by the arbitrator's factual findings and conclusion that King failed to prove disparate treatment.  ECF No. 64 at 25. Arbitration decisions pursued under a collective bargaining agreement do not have preclusive effect in Title VII cases.  *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59-60 (1974).  The court considers the employee's claim *de novo*; "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate."  *Id.* at 60 (footnote omitted).   There is also no preclusive effect as to § 1983 actions.  *McDonald v. City of W. Branch, Mich.*, 466 U.S. 284, 292 (1984).  The Department has presented no authority to the contrary.   Accordingly, summary judgment as to this issue is denied.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (ECF No. 64) is **DENIED**.

**SO ORDERED.**

Dated this 12th day of July, 2016.


/s/ Jon D. Levy
**U.S. DISTRICT JUDGE**